May it please the Court. Good morning, Your Honor. Steve Sanfilippo for Appellants Art Midwest, Incorporated and American Realty Trust, Incorporated. This case is now before the Court for the third time. During the last appeal, in an opinion drafted by Judge Higginson, this Court affirmed a 2011 judgment with respect to five of six categories of damages but vacated with respect to a sixth category and remanded with instructions to recalculate which measure of damage was applicable to that element and then recalculate damage on that element and enter a new judgment with respect to that. Instead, the District Court recalculated pre-judgment interest all the way through the length of the judgment, the remand judgment in July 2014, even on the affirmed elements of damages. In this appeal, appellants raised three issues. The first is with respect to that recalculation of pre-judgment interest all the way through the July 2014 judgment. The second is the District Court's conclusion that it was barred by the law, the case doctrine and or the mandate rule from deciding whether or not the interest rate on that section 402D damage award should be 5% instead of 19% and the third should the Court decide to reach it instead of remanding would be that the 19% interest rate is in no basis whatsoever in the contract on which that 402D damage award is based. Let me ask you something. It may be in the briefs but I can't remember. How much money are we talking about at this point with the differential and the interest percentage? Substantial amount. The recalculation of interest alone, even if you leave the 19% rate is $11.4 million between the October 2011 judgment and the two judgments and that's leaving the 19% rate. It grows to about $31 million if you add in that that 19% rate should have been 5%. So we're talking anywhere between $11.4 and over $30 million worth of just additionally accrued pre-judgment interest. No wonder you keep coming back here. Yeah, there's a reason we keep coming back. So first with respect. When it went down, we may be responsible. I in particular may be responsible. When the remand occurred, both sides argued, tried to re-litigate. Didn't the Clapper parties also try to urge more pre-judgment interest to apply? In the underlying, yes. They wanted more when it went back. We wanted less and in fact, they will tell you, they've raised a waiver in their briefs to this Court. Before the 2014 judgment was in, they went out of their way to say how we litigated that 19% issue during this last appeal all over the place and in fact, they pointed to our appellate briefs every place we laid it because that was what supported their argument that that 19% interest rate was decided in the last appeal and that's what convinced the District Court that the law, the case doctrine and or the mandate rule prevented it from deciding whether that 19% rate should apply or the 5% rate. But in the underlying record, I think that ART contests neither the 19% interest rate nor the calculation of pre-judgment interest. That was not in the July 2014. No, I know. That was in the before the 2011 and I will say they vociferously objected to the award of that damage because of the double counting and because of the fact that it had been satisfied. In their mind, there was no damage. So did they specifically say, oh and by the way, the 19% rate? They did not in that case before that judgment before us on appeal either. They did. Oh yes, they did on appeal before you. They did and that's what I'm getting at in their brief that they say that we didn't raise it in this appeal the last time we raised it in the statement of issues. We raised it throughout the body of the brief in the argument section in the argument section of our brief. You're going to this court and I will give you a record of that. 19% was raised in the context of saying the Inland Road loan had been repaid. I don't believe you ever developed the argument that 19% shouldn't come across and apply to 4.02 at all, right? Or do you have a reference to that? I'm going to reference you to their reply. I'm asking your brief. In your brief, where do you argue that the that the what's the Atlantic um contract shouldn't cross apply to the partnership agreement at all and then 19% shouldn't apply at all? Where was that argument? In my brief? Yeah. It was if I don't have the sites here, I'll tell you why. I wrote out the sites to their motion because they specifically cite in their motion all the places in our last appellate brief where it was cited. And that is in one two zero R O A one two zero three five one two zero one two zero three five is for both of them. Post remand reply. It cannot be denied that art appealed the district court's decision to apply the 19% default interest rate. Right. And they you did argue my memory is both in the brief and an argument. You said that 19% was miscalculated because we'd already repaid some of the amounts owed. But but I don't remember any argument that the party's never had a meeting of minds that the 19% negotiate for the Atlantic note would apply to the partnership agreement. You think that's argued in the argument section that's elaborated as an argument on appeal? These are my record sites that I have for one two zero four six seven one one two zero four six dash four seven and one two zero five two five three. The specific nuance you raise is my recollection. We did. We did argue that 19% wasn't based. Did we argue it as articulately as maybe we had hoped? I can't remember exactly. I can tell you we looked in. It was raised. We raised the fact that the 19% interest rate shouldn't have applied and we raise it in the body and the raised in that case and in page limits and everything. I can't tell you we would laid it out in the level of detail we would have liked to. But it was raised before the district judge. He raised it on remanded before the district judge. And the first time the first time we did, we attacked the award itself and when you win on all kind and we want on that in front of him. But you want if we won on that, we didn't argue the 19% per se to him. We did in the appeal when we came up and did you waive it by not arguing it to the district judge on remand? I don't think that we did. First of all, I will tell you the district court here and the judgment before this court didn't find that we waived it. And in fact, waiver was never. It wasn't argued in the last appeal that we waived it in the district court. It wasn't argued to the district court before he entered this July judgment that we waived it. One case they cite that you didn't respond to is the medical center pharmacy case. In other words, you had a when when responding to their waiver argument, I think you had three counter arguments. The last being that there's no application of waiver doctrine across appeals and and and it would seem to me that's not consistent with the case. They rely on medical center pharmacy versus Holder. You remember that case? I do not. Okay. I will tell you in conjunction if the court will allow me, we have since there is Texas Supreme Court has issued another case on that recalculation of prejudgment interest issue in May after our briefing was closed. And I'm going to put a 28 J letter in on that. If the court would allow me, I would add a sentence response to this. I just, I don't remember the case doesn't stick out to me, but I will also tell the court that as you know, it has the authority even to, and I'm pulling this word for word out of the Cushman case, Cushman VGC services, even on plain error review allows the reversal of even waived issues, quote unquote, if there's been a miscarriage of justice and I would submit to you based upon the clarity of the fact that there was error and the dollar values involved. This is one of those exceedingly rare cases where we would ask that the court if to the extent you find waiver, even though the district court didn't, that you would consider looking at it under at least a plain error review, because even under that review, it can't withstand scrutiny in our mind. Well, peeling back may be easier issue or the counts that we affirmed on. What's your, you're relying principally on our massenter decision for the proposition that those would have to prejudgment issues would have to have stopped as of the 2011 judgment. Well, I'm relying mainly on your, your decisions that say in a diversity case such as this, as this prejudgment interest is controlled by state law and it is crystal clear under state law that in a case like this where it is remanded in the district court does not have to reopen the record and consider new evidence, which is, but no, I'm focusing on the counts where we affirmed there was no remand even, right? The damage. Oh yeah. Arguably. Yeah. Right. But he recalculated interest on all of those in which, like I said, what we're arguing on is that's incorrect under Texas law. Yes, you're, you have cases out there. There, there's a few of them. There's the Reeves case and there's a Brown and Root case. In fact, the Brown and Root case is probably the best one. The issue with it is it's a 1963 case. It's a post Briggs, but pre rule two thirties rule for 37 B that says, basically when you say in your judgment, you're affirming as to five of six elements of damages. You don't have to tell, and interest was included in that underlying judgment. Your mandate doesn't have to say what to do about interest with those other ones. It's already affirmed. And as to the five of the six, were you to apply federal law? Yes, that would be our argument. But our argument is it's Texas law that applies and under those Supreme Court cases. And like I said, there have been three of them. The Bramlett case in 2013 was the one that started it. That's it for purposes of calculating interest that the date judgment is rendered. Is that data the original judgment? If they don't have to reopen the record 2014, they went to long, long said the same thing, came to the opposite conclusion because the court had to reopen the record, but reaffirmed that the turning point is, do you have to reopen the record or not? And while those two cases were post judgment interest cases, because in the one prejudgment interest was capped under the Med-Mal statute, in the other they had waived it. In the May case they just issued is the Ventling v. Johnson 2015 Westlaw 2148056. They clarify that that date judgment is rendered is for, applies to the prejudgment interest as well as the post judgment. And that's the only conclusion you reach under the statutes as well because the Texas finance code statutes for the pre and post both turn on the date judgment is rendered. So with respect to that and, and certainly we would say even without getting to, to the, the five elements that judgment was affirmed on, it is clear what this court intended to do. It absolutely should not have been recalculated on those elements. And that's about a $5.7 million difference. We would also say that under those Texas cases, even, even with the, uh, element having to, you instructing the court to reconsider, uh, recalculate the interest even under that one under Texas law, that still goes back to the date of the original judgment. So. How, how does that harmonize with Reeves and 37B and whether the district court had authority to do that? I don't think 37B applies because 37B, it's based on Briggs, right? And the commentary to 37B and Briggs both say this is to apply when a court directs that a money judgment be entered in the district court. This court didn't send it back for the direction of the entry of a money judgment. And the examples that 30, the comments that 37B give is when a JMAL is granted after a trial. And this court reverses that JMAL and sends it back for entry of the judgment on the verdict, reinstatement of the verdict in, in the amount of the verdict. That is an instruction sending back to enter a judgment. And it's on something that prejudgment interest was never talked about, right? Cause it's the jury verdict in those scenarios. Yeah. You don't have anything in the judgment that you got a 37B problem, which this court has said in, I think it is the Martin V walk case. If there were a 37B problem, this court has the authority under fifth circuit local rule 41.2 to recall its mandate. And in that case, this court found an injustice, quote unquote, where a losing party challenges an award of prejudgment interest that the district court had no authority to grant. That is, I mean, this is just a procedural wrinkle about our local rules, but you may know it cause you've studied it more closely. Would you have to move for to recall mandate to the original panel? There are, there are two sides to this. We have, we have moved after we got their brief to the original panel and it was denied. But these cases say, even if somebody has, even if they have not moved under that rule, that gives you the authority to recall it, uh, to prevent an injustice. And that would be a second bite at the recall apple. And that's only if there even is a 37B problem, which that's if there is. And I'll tell you, look at your judgment. In my mind, if there's a 37B at all, your judgment was silent as to the other five elements. It only directed the recalculation of prejudgment interest as to 402D. If there's a, what if, what if, what if the double counting hadn't been just a re a ministerial clerical recalculation, if they would have had to be evidence taking to ascertain the right 2001, 2000, whatever the, if they had to reopen the record to take in new evidence. Now you've got a different issue. Yeah. Although I will tell you, vent Ling, it would still be a little bit of a gray area because the, the latest case that came out, Bramlett said, either you reopen the record or you don't. And then Long said, if you have to reopen the record, then you go back to the new judgment. Fentling went back to the old judgment, even though they had to reopen the record. But the reopening of the record was on an attorney fee issue, which was sort of ancillary to an element that was already affirmed. And under that scenario, vent Ling said, you're still going back to the old judgment. So with that, uh, just about out of time, we would say that the court ought to reverse on all grounds and send it back for recalculation with, uh, through the original judgment at 5% on the 402 D award. All right. Thank you. Save some rebuttal time. I'm not going to try to say me or name. Good morning. Um, this is the third time we've been here, um, in, in what's now been 16 years of litigation, uh, over this matter. Um, in responding to the argument, uh, made by counsel, um, this morning, um, I think it was glossed over that. In fact, these very same arguments, um, were made to the original panel, um, in a motion to recall or reform the recall and reform the mandate. Um, the, uh, we indicated, we noted in our response brief, uh, the last brief we had, the first panel, first panel, and what occurred, we, we noted that under the Reeves case, the Reeves versus old man river towing, um, in 1985 fifth circuit case, that the longstanding precedent establishes that a district court possesses no authority pod remand to calculate post judgment interest from a date before it's post remand decision, unless the mandate of the court of appeals directs otherwise rule 37 B, um, simply says that, um, from, from the standpoint of the federal pellet procedure says that the court where it's, where it directs the district court to enter a money judgment must discuss interest, and it stops there. It's the Reeves case, and then the Vickers case, and the other cases that follow, that then clarify for the district court that if there is not a specific, under the federal procedure, if there is not a specific reference to when interest is to start, in, in this case, that it is to start from the prior judgment, then the district court has no authority upon remand to calculate post judgment interest from a date before it's post remand decision. So Judge Godbee did in this case exactly what the mandate provided he should do. After we filed our response, um, Art, the appellees filed a motion on April 2nd of 2015 to recall and reform the mandate, first filed in this case, and then as directed by the original court case that issued the mandate, case number 11-11140, the original case. On May, uh, in that, in that motion, the appellants raised the identical issues that have been raised in this appeal. They repeated their appeals brief to the original panel. We opposed that motion, and on May 12th, 2015, the original panel, in that case, denied the motion. In its entirety. The mandate that exists now, according to the original panel that had heard the case and had issued the mandate, um, was that, um, or didn't change that mandate. And according to Reeves, where interest isn't, uh, the, the interest isn't stated specifically to begin from the prior judgment, then it should begin from the second or the remand judgment. That's a matter of, of, of federal court procedure. It is, if, if you then go and look at the Long and the Bramlett decisions that the appellees rely on, they are state court decisions. There is no, um, the line is blurred, and we, we, we responded that they, they go back and forth between pre-judgment and post-judgment interest, as if it doesn't matter. In the Mew v. Fogelman case, um, it was very clear that while pre-judgment interest is considered to be a matter of substantive law that is controlled by state law, post-judgment interest is controlled by 28 U.S.C. 1961, and is strictly a matter of, for the federal courts to decide. The Long and the Bramlett case did not rely on substantive state law in order to come to the conclusion they did. The Long and the Bramlett case instead cite to the state finance code, which in fact does address pre-judgment interest, but in those cases, which were injury cases, um, they cite to a different finance code than is, than is applicable with respect to this case. As to the amount, start with the easiest for me though, as to the amounts that were affirmed by the second panel, the panel I sat on, why, why does, why would not those have to be determined as to the original judgment? Judge Godby did exactly where you have a second judgment, right? The entirety of the judgment is restated. You don't simply say that, okay, now we have two different judgments and, and I want to point out why that's important. The, in this interim time period, the appellees the defendants took advantage of the fact that the judgment had been vacated. And while the court affirmed as to everything other than to recalculate these two amounts, not the 19%, not anything else, everything else was affirmed. The court, they, they took advantage of that time period and filed not one, but two, but three different bankruptcy proceedings. Ultimately they were dismissed as bad faith filings based on fraudulent transfers that were made by these very same defendants. They took advantage of the interim time period to in fact argue that the entire judgment had been vacated. And that a new judgment had to be entered as to the entirety of the matter. And then looking at Reeves. Well, look at Massander as to those amounts. How do you distinguish Massander? I, I, I think that, I think that the language in Reeves or Vickers would, would control it. I, the mandate is as it's stated, does say Determine interest. To determine interest. I, I understand that argument and that's the trickier one for me. But as to the amounts where we affirmed, it seems very difficult for you to extricate from Massander and the reasoning there. Well, with respect to the Long and the Bramlett cases, and I want to finish that argument, they turned on, not the state finance code, that is not at issue, and I want to discuss that code in relationship to the 19% interest, but they turned on Federal Rule Texas, Federal Appellate Rule of Procedure 43.3. This rule about that unless something is record reopened, unless all these things occurred, you, you have to start from the remand from the date of the original judgment. That is a Federal Rule, that is a Texas State Appellate Rule of Procedure. We know that under the Mew case, that rules of procedure, that Federal Rules of Procedure are followed. In this case, the Reeves case, in this case 1961, in terms of when, when, when post-judgment interest applies. The, and so that rule that they're talking about is one that was developed by the Texas Appellate Court. But more than that, the, the underlying justification that the Long, in the Long case and the Bramlett case that's discussed is that the injustice that occurs is that the plaintiff in those cases, because of the dichotomy under Texas law between pre-judgment and post-judgment interest, that the plaintiff in that case is punished for the loss of the use of money. So they wanted to make the plaintiff whole. And they state that that's the reason that they're interpreting it that way in order to make it whole. What they're suggesting does the opposite. It doesn't make us whole. In fact, there's a difference because under the Federal judgment interest rate, in, the judgment interest rate is something less than 1 percent in terms of post-judgment interest that's, that's controlled by Federal law, while under state law, which was all that the Texas Supreme Court was applying. The post-judgment interest rate is either the exact same amount as the pre-judgment interest rate or, with respect to contracts, is as high as 18 percenters stated under the contract. We'd take that, but it doesn't apply. They argue that it should have been only 18 percent on pre-judgment interest when, when that statute 34.07, I'm sorry, 34.002, the Texas Finance Code, only relates to post-judgment. So on post-judgment, if we had been in Texas state court and they want to benefit from the Federal, the state court appellate rule, we would have received up to 18 percent interest and this wouldn't be an issue at all. What they're doing is taking advantage of the fact that you have Federal court and the substantive rights that are provided in Federal court and those under the state court and then combining them together, which they're not supposed to be. They then looking for a result that gives them the windfall, because ultimately the partnership to whom these contributions were to be, were to make that have to pay off their liabilities once the money is collected is going to be short. The partnership, the underlying partnership, continues to be obligated with respect to this promissory note and the 19 percent default interest rate stated. Well, stated, I mean, that's a separate argument. Stated in the Atlantic note, which they're contending wasn't negotiated as to the partnership agreement. But the partnership agreement specifically exhibit, the partnership agreement discusses the liabilities of the 4.02d, the indebtedness of the liabilities to be paid. Debt is defined in the partnership agreement as specifically attached on Exhibit B. Sure enough, on Exhibit B. Did John D. make that finding? Yes. On summary judgment, the very first time. He said the 19 percent. That's the analysis that he went through. Okay. That's the analysis he went through. But I was wondering whether he did that. I couldn't remember this record. I can't remember exactly. My recollection at the time that I had been involved in that argument was that we certainly pointed out to him that Exhibit B, the indebtedness that the partnership has to calculate to determine the amount to be contributed under Section 4.02d, is the two notes that are referenced in Exhibit B, the first being the Inland note, which they claim they paid off and Judge Gottlieb found they did, and the second is the Atlantic 30 note, which is exactly the same note that contained the default interest rate. So that note is not only just incorporated by reference, but it's specifically included in the Section 4.02d by definition. You're saying that in district court they didn't argue that that default interest rate shouldn't apply to the partnership agreement? They never made that argument or they did make that argument and lost? They did make that argument and they lost on summary judgment. Okay. And then up to us? They did not make that argument. Out of all the other arguments they made, they didn't mention, didn't go to the 19 percent. This Court, however, I'm sorry, this Court, and I recognize that Your Honor was on that panel, the last panel, in terms of when the mandate was issued, but in front of that panel, the 19 percent wasn't argued. However, this Court or that Court in the prior appeal did reference the 19 percent in a footnote. It was considered and it was part of that, but either they should have argued it or, in which case it was waived, and certainly it was considered by the district court judge at the time of the trial. Frankly, Your Honor, while we were sitting in chambers trying to work on instructions for the jury, the promissory note and the rate of interest on that promissory note was a contentious argument before the court in chambers for, I think probably it was two hours, should the interest rate, because the discussion was should we have the jury decide this interest rate or should the court decide the interest rate to apply, or will the jury be confused? And the court had before it the promissory note and the partnership agreement with all counsel in chambers, and we discussed the 19 percent. And the judge said, no, I'm going to leave for them to just make the decision of what the amount should be, and I'm going to apply interest. And in the court's instructions to the jury, Judge Godbee states that he's going to apply interest and for them not to consider interest. So for them to argue that this wasn't, they didn't have a shot at this, I mean, flies in the face of everything that's transpired, you know, through the second trial and through all of those discussions, whether in jury, in conferences to jury instructions or later on appeal. That 19 percent was discussed, but even if it wasn't, under Texas state law, and we agree that substantive law governs prejudgment interest, state substantive law, there is no finance code provision, statute, that deals with breaches of contract. There is one as to wrongful death, which they cite, and then they cite to a different provision that says that it should be the same for pre- and post-interest. But it can't be as to post-interest because the Federal rule comes into play, and Federal law controls on the post-interest as a matter of procedure. The as a result, the pre-interest, the contract law on pre-interest in State court is common law. And common law in Texas is to look at the agreements and what was the intent of the parties and whether it was stated. Again, the partnership agreement specifically not only incorporates, but references the debt that is supposed to be considered for purposes of 4.02d, the provision at issue for contribution, and attaches an Exhibit B, and there it is. The Atlantic 30 note, which is the indebtedness that is supposed to be considered in calculating it, and it contains the 19 percent default interest rate. So did Judge Godball plug in the 19 percent on remand? Well, he plugged in the 19 percent. He didn't plug it in. He used it consistently throughout this time period. So when the Court said to take the damages that had already contained the interest, the 19 percent interest, the jury made two separate findings. One for 2001. The partnership agreement required, after 2001, a contribution every year. After that, to make the assets equal to liability so the partnership could stay buoyant. And if it wasn't, then Art, who was getting the benefit of these eight properties that were supposed to be some $118 million worth of properties, that was receiving the benefit, was supposed to make up the difference on anything that was short. And it was those notes, this Atlantic 30 note, was a mortgage note on one of the properties they took. It has a default interest rate of 19 percent. That was, these are highly sophisticated parties that negotiated this $118 million purchase of these multiple properties throughout the Midwest. That 19 percent interest was stated specifically in the partnership agreement, in the section at issue, it speaks to the indebtedness, in the definitional section as to debt, and then attached as Exhibit B where the debt that's supposed to be used to calculate, the Atlantic 30 note, is specifically identified. That note, then, if you look at it, okay, how do I calculate what's owed under this note to see what's owed under 4.02d has a 19 percent default interest rate. So it's in the contract. Just briefly as to, and I don't know if it needs to be, the statute, they cite that 18 percent interest is the maximum. That's a post-judgment provision under the state finance code. One, again, federal law controls as to post-judgment interest. Number two, we didn't get 18 percent. If we had gotten 18 percent, that would have been wonderful. We only got 1 percent, or 1.1 percent, which is the federal judgment interest rate. So even if it did apply, that wasn't given to the Atlantic parties at this juncture. Again, I want to point out that the issue of interest with respect to the court, in the federal court, is a matter of discretion. Even with respect to pre-judgment interest, even if state law identifies pre-judgment interest of a specific amount or specific rate, the federal district court does not have to, in its review, does not have to apply that rate. It could choose something else. It is that discretion of the federal court that we can't, I know there hasn't been an Erie-type analysis that's been done here or argued in the motions or argued in the briefs with respect to substantive versus federal procedural law and what should apply in this case. But even if you take a look at the pre-question that you're supposed to do before you look at an Erie-type analysis, you look at as to whether the parties have been negatively affected by substantive law. In this case, we're talking about in the Phillips v. Bramlett and in the Long case they cite to, it is a Texas state appellate rule of procedure. Federal rules of procedure apply. We know that even before getting into an Erie analysis, federal rules of procedure apply, whether you look at 1961, whether you look at Rule 37, or you look at the Reeves or Vickers cases. And again, the reason why, what their argument does is turns even the Long and the Phillips cases on their heads. The idea behind the Texas state appellate rule was to make the plaintiff whole. It was to make sure they wanted to get post-judgment interest because pre-judgment interest on that action wasn't available. They said, so why should the plaintiff be punished by only starting from the later date? Instead, they said, look, no, they should get it from the earlier date, the judgment, and it should apply so that it makes them whole. Because of the Federal rule here, it is an opposite result. Instead of making the plaintiff whole, instead of making the partnership whole so it could pay its debts, it's doing the opposite. It is taking money away that the partnership could otherwise pay. And if we want to talk about inequities, all right, and we want to talk about discretion, all right, they could have paid this standard. They could have posted a bond. Instead, they chose to file bankruptcies, three of them, the last of which, and I attached a copy of Judge Hale's opinion that preceded this Court's opinion. I think, well, actually, it came after it, about a month afterwards. The judge dismissed the third filed bankruptcy by this appellee as a bad faith filing. It premised it on the numerous fraudulent transfers. We are now embroiled in a new lawsuit before Judge Fitzwater in the Texas court, trying to undo the numerous fraudulent transfers. They transferred over a hundred, they transferred a controlling interest, a 70% controlling interest in a publicly held company, TCI, publicly traded, that has over $2 billion of assets. They transferred that out three days before the trial in 2011 that started before Judge Gottlieb. They moved all those assets out. Had they not filed the judgment that would have been entered on remand, it would have happened sooner. It was delayed because of the stay that was entered, not once, but twice, as it moved. First they filed in Nevada, staying away from Texas, then they filed it in Georgia, and then it was finally moved to Texas. Equity here, with respect to what transpired, and in making the plaintiff whole, is what, as inapplicable as I believe they are, what Long and Bramlett decisions sought to find. You're out of town, but tell me how much time was spent in the bankruptcy litigation. In other words, how much more interest accrued because of this amount of time? I believe that the bankruptcy litigation in the multiple times they filed was almost three years. How many? Almost three years. Three years, okay. All right. Thank you, sir. We have your argument. Thank you. You have some rebuttal time? Two quick points. I don't know about the bankruptcy or the interest that accrued for that point, and I also don't know if that bankruptcy was before the 2011 judgment, and then the interest would have been built in thereafter. And I've got a lot to get to, but I'm going to touch that equity thing. I'd like to come to that in the end, but in case I don't get back to it, two things. There is nothing about these interest numbers that goes to compensating plaintiff. He's compensated already. This is overcompensation and punishment of the defendants, both of which is against Texas policy underlying the prejudgment interest rules. And the second thing is when you want to talk about delay, I would remind the court, Judge Higginson, as you pointed out in the opinion, we are only here because the 4.02d damage award awarded overlapping amounts. That is something they knew before the 2011 judgment was entered. They told it to the jury that they weren't entitled to all those things. Even the district court noted that he was concerned about the overlap. Nevertheless, they convinced the district court to enter that, and then when you called them on it on appeal, they walked away from it right away and admitted that that was an overlapping amount. So the whole reason we're here between 2011 and 2014 is because they pursued a baseless claim on that 4.02d damage award. So when you talk about equities as to the difference in that prejudgment from 2011 to 2014, that's where the equities lie, and they're squarely on the side of the appellant. Now, with respect to the concept of the calculation of contract interest, first, the Bramlett case and the Long case, they didn't rely on procedural rules. What they relied on was the Texas Finance Code's definition of when a judgment is rendered. That's what they were looking. They looked at some other things to come up with what that means under the Texas Finance Code, but the finding was what does the date judgment is rendered mean under that finance code, and you will see that in the Ventling case as we get there, which talks nothing about procedural rules. It talks only about Bramlett and the fact that for purposes of that finance code, judgment is rendered on the date of the original judgment if you don't open the record. With respect to the contract judgment interest rates, first of all, Section 304.003 of the Finance Code applies because, as this Court knows and has recognized on multiple occasions, while the award here was under the common law, Texas's Supreme Court precedent holds that the statutory scheme and the common law scheme are aligned such that the statutory provisions apply in common law type cases, and that's in the Johnson and Higgins case, and that is in multiple cases in our briefs from this Court recognizing that as well, including, I think, the Arete case, Judge Clement, which you were on the panel of. So there's no question that those statutes apply. Where the 18% argument comes from with respect to the Texas Finance Code's maximum amount of post-judgment interest is under the Texas pre-judgment interest scheme, pre-judgment interest equals post-judgment interest. So if the maximum rate of post-judgment interest is 18% under the Texas Finance Code and pre-judgment interest equals post-judgment interest, that's the amount that applies to cap the pre-judgment interest. And with respect to the Atlantic note and being incorporated into the contract, and we get to this point, and I know there's issues, you have some concern as to whether this was raised, and when I tell you this is a prime candidate for plain error review even if it wasn't raised, which I think it was properly raised, here is why. You look at that contract, and there is no way that that 19% rate applies to a breach of that partnership agreement. That partnership agreement defines the entire agreement as it's in Section 13, I believe it is, states that the agreement is made up entirely of the partnership agreement and the exhibits thereto. Exhibit C is a list of the partnership debts. That Atlantic note is recognized under that list as a debt of the partnership. Its terms are not incorporated in that contract. All it is is it's referenced by the debt, the indebtedness, exemplified in the note or whatever that is. Those provisions are not in there. Even if they were, this award was awarded against the art entity that was a limited partner in the partnership. Under the partnership agreement, Section 8.03, a limited partner is not liable for any debt of the entity other than its capital contribution. So even if the terms were brought into the note, they could never be responsible for the interest on that debt. Instead, and if you let me finish this point, here is where that note comes in. It's an element of damages, as the court's jury charge noted. The interest on the underlying indebtedness is an element of damages, not the prejudgment rate. Thank you, Your Honor.